J. L. WHITTINGTON, ADMINISTRATOR v. VIRGINIA IRON, COAL AND COKE COMPANY.

(Filed 2 June, 1920.)

1. **Courts— Sister States— Decisions— Master and Servant— Employer and Employee—Safe Place to Work.**

   The courts of this State and of Virginia are in harmony upon the principle of the non-delegable duty of the employer to provide a reasonably safe place for the employees to work in the observance of due or reasonable care, and this principle will be applied on the trial here, when the cause of action arose there.

2. **Evidence—Negligence—Conjecture—Circumstantial Evidence.**

   While evidence which does no more than raise a conjecture or suspicion of a negligent act alleged is not alone of sufficient probative force to be submitted to the jury, this act may be proved by circumstantial evidence, and if the facts proved render it probable that the defendant violated its duty, the question is for the jury to decide.

**3. Same—Mines—Master and Servant—Employer and Employee—Proximate Cause.**

Where negligence is relied on in an action against the operator of a coal mine that he had failed in his duty to provide his employee a safe place to work therein, etc., evidence is sufficient for the determination of the jury, that tends to show he had permitted an accumulation of rubbish called "gob," in miner's parlance, along the track in a tunnel whereon the wheels of a coal car ran, driven by a tandem of mules by the employee, so as not to leave enough or the usual space between the sides of the car and the ridge or side of the tunnel, required for the safety of the employee in giving the attention necessary to the performance of his work, and that as a reasonable or probable result therefrom under the conditions, and as the proximate cause, the employee was found dead on the track, under the car, though there was no eye witness to the killing or the immediate circumstances surrounding it.

**4. Same.**

Upon motion to nonsuit the evidence, the courts will accept as true the plaintiff's evidence, and resolve every reasonable inference in his favor; and where the evidence tends circumstantially to show that an employee to drive a coal car in the tunnel of a mine met his death through the negligent failure of his employer to leave him proper space in the tunnel to perform his work, and this was the proximate cause of his death, for which damages are sought in the action, it is immaterial whether the dangerous conditions existing at the time caused the employee to walk on the outside of the rails in the performance of a duty, and stumbled and fell, or he was forced between the rails by the conditions on the outside, and the death resulted in one way or the other, if the inferences are permissible in either event that it was the proximate cause of the defendant's negligent act, and the defendant would be liable in the absence of contributory negligence on the plaintiff's part.

**5. Limitation of Actions— Pleadings— Amendments— Statutes— Sister States—New Cause of Action.**

When the cause of action for damages for a wrongful death arose in another state, wherein a statute provides that it shall be brought within twelve months from the time of the death, but if the action has been commenced within the stated time and abates or is not decided upon its merits, and another suit is ·commenced in twelve months thereafter, no part of the first period shall be counted, an objection to an amendment to the complaint in an action brought in our own Courts, upon the ground that it sets up a new cause of action, after the statute had run, by alleging the statute of another state permitting .a recovery in actions of this character, when the suit was commenced in the statutory time and the amendment was allowed within the second statutory period; and *Held further*, the objection is untenable under our own decisions. *Renn v. R. R.*, 170 N. C., 128.

APPEAL by defendant from *Long, J.*, at the October Term, 1919, of WILKES.

This action is for the alleged negligent killing of plaintiff's intestate while working in defendant company's coal mine, on Tom's Creek, Virginia, 8 September, 1917.

The allegation of negligence relied on by the plaintiff is that defendant did not furnish a reasonably safe place to work.

The intestate was employed by defendant company as a driver of a mule team in its mines. The teams are hitched to little cars that run on tracks, similar to ordinary railroad tracks, laid along the tunnels, or entries, that lead into the mines. The rails, laid on cross-ties, are 44 inches apart. The mules are hitched to the car tandem, or "spike fashion," and the rear mule walks about six feet in front of the car, being hitched by means of what is called a "tail chain." The mules walk in the middle of the track between the rails. The cars are low and project over the rails on each side from 12 to 18 inches. Against the sides, or ribs, of the entries are piled pieces of slate, small lumps of coal, and other rubbish, in miners' parlance called "gob."

The evidence to prove negligence was largely circumstantial, as no one saw the intestate at the time he was killed.

Russell Anderson, who was nearest to him, testified, among other things, as follows: "I was working for defendant company at Bondtown, Va., 8 September, 1917, at time John Allen Whittington was killed, and knew him, but not very well; I had been there only two or three months. John Allen Whittington was working for defendant company at the time he was killed in what is known as Entry No. 11, Swansea Mine, at Bondtown, Va.; he was driving two mules pulling cars from the rooms; these cars would hold about four tons of coal; on 8 September Whittington was working in Ninth West Swansea, and was on 11 West at the time he was injured, and that he was with him; Whittington was pulling coal for another driver on 11th West; he was driving two mules, one hitched in front of the other—spike fashion; witness knew the mules Whittington was driving, and they were gentle with reference to their working qualities; the lead mule was balky sometimes; at the time Whittington was injured witness was helping a fellow break a mule; that he was about two car lengths from Whittington when he was injured, and a car length is about seven feet; that the injury occurred about as follows: We coupled up the load and started out. A piece of slate slid down off the gob pile. I got off and threw it back, and when I got on the car I did not see him anywhere. I hallowed at John and he did not answer, and then I heard him groan. Neither of the mules balked at the time of the injury. The mules had nŏt stopped. Whittington was striking the lead mules across the back with a strap. I don't know why. On 8 September, at the time Whittington was injured in Entry No. 11, slate and gob stuff was on the outside of the rail stacked up like a wall; ties, props and things like that were lying across the road; slate piled up along the road; could not pass a car in some places; had to climb over; do not know that the

track had been recently relaid in this entry. Whittington died from the injuries. When the mules are walking along in the middle of the track, as they were on this occasion, there is two or three feet open space along by the side of the mule and the rail, and all that is kept clear in order that the cars will not wreck. Don't know why the props along the side of the entry; to hold the slate up, I guess. Laying along the road; sticking out and laying out everywhere—slate piled around there; props were along the side of entry, two props where he was killed. The two props which looked like they had been set for the purpose of putting a collar on one time; had some slate or gob around them down next to the bottom just about as high as the car is. Had to climb over the top to see what was the matter."

S. M. Mullins testified: "The entry was near the point where he was injured in pretty bad condition; they had some slate there, some slack and some rubbish timber; rotten timber; little old rotten timber; something like rotten timber anyway, maybe two or three pieces there. The slate was on the side of the track, on the right-hand side. I never noticed the left-hand side of the track, the right side, the brake side, was the gob and some timbers; there was not sufficient room along the entry where the deceased was injured for him to have walked between the outside of the rail and the walls of the entry. The entry in order for a driver to discharge his duties in safety should be clear for him to get off to catch the brake if something should happen, for him to work in safe condition between the car and the rib. The deceased was lying on his face and belly under the car; his head was closer to the right-hand rail as you go up than to the left-hand rail; his head was in the direction of the rear of the trip, and his feet towards the mules. The entry should be in good shape that the driver could get off, set his brakes if something should happen, the mules fall down, or something happens to keep from killing the mule, and that is for the protection of the mules. On a level track where the grade is practically level, and the cars will not run without being pulled, and the driver's place is on the front end of the car, I would want the side of the track outside of the rail to be clear; it looks like it should be clear; sometimes if the track is level you want to set the brake provided you want to hook the mule up for something to keep the mule from pulling the car."

W. W. Nelton testified: "The entry at the place where we found him in the car was pretty well gobbed up, slate and gob on each side of the car; there was no room for a person to have walked between the outside rail and the rib; there was slate and dirt and a few rotten timbers. I have worked off and on in the mines for the last 12 years. In order that the driver may perform his duties with ordinary safety I should think the entry should be clear, should be clean between the rib and rails

along so that if an accident should happen you could have room to get in the clear. There was a space of 12 or 14 inches on either side of the rail that was free of gob.".

A. B. Baldwin testified: "The condition of that entry at that time at the place we found him under the car was very bad, in very bad shape. The entry of the heading had been driven about 12 feet wide, the regular width; the track was laid a little to one side of the entry, a little more to one rib than to the other, and the slate had fallen from the top and had been cribbed up on one side of the tracks on the right-hand side of the car, going up facing the cars you could pass around the cars if the cars were standing still; on the other side the track was close to the rib, and there were some slate and timbers close to the track between the car and rib. There was not sufficient room on either side of the cars between the outside of the rail and the rib of the entry at the point of accident for a person to walk or pass in safety while the cars were in motion; if the car was standing still you could pass the car very well. I have had 14 years experience as a miner in the mines. In order for a driver to perform his duties with a reasonable degree of safety I think the entry should be kept clear of all rubbish and sufficient distance from the car for a man to pass through at any place along the entry. On all entries he has generally from 14 to 18 inches on the outside of the rail to walk on. That space is supposed to be free from obstruction; I have been timber man in the mines a good deal, and never allowed to set timbers within closer than 18 inches of the track."

Horace Turpin testified: "The place where he was under the car was a pretty close place, the rib was pretty close. At some places there was sufficient room between the outside rail and the rib or wall of the entry for a party to pass between a moving car with safety; at the place where we got him from under the car it was not, because it kinder turned down hill. There was a lot of gob there by the side of the rib close to the track. I have been working in the mines two or three years. The entry, in order for a driver to perform his duties with reasonable safety, ought to be clear; I think it ought."

There was a motion for judgment of nonsuit, which was overruled, and defendant excepted.

The jury returned a verdict in favor of the plaintiff, and from the judgment pronounced thereon the defendant appealed.

*Bowie & Austin for plaintiff.*
*L. A. Nuckols, F. B. Hendren, and F. A. Linney for defendant.*

ALLEN, J. The principles of law discussed before us are simple, and the only difficulty is in their application to the evidence.

The courts of Virginia and of this State are in perfect harmony as to the duty of the employer to provide a reasonably safe place for the employee to work, as is shown by the opinion of the Virginia Court in *Trotter v. R. R.,* 98 S. E., 623, in which it is said: "It is one of the nonassignable duties of the master to use due care to furnish the servant a reasonably safe place in which to work, and reasonably safe tools and utensils with which to work, and if he fails to do so he is liable to the servant for injuries proximately resulting to such servant from such failure," and by the opinion in *Clements v. Power Co.,* 178 N. C., 55, as follows: "The rule is well established that the duty imposed upon the employer to provide a reasonably safe place to work, and reasonably safe tools and appliances, is nondelegable."

The authorities are also ample to sustain the position of the defendant that evidence which merely makes it possible or does no more than raise a conjecture or suspicion of the fact alleged ought not to be left to a jury (see *S. v. Vinson,* 63 N. C., 335; *Brown v. Kinsey,* 81 N. C., 245; *Byrd v. Express Co.,* 139 N. C., 273; *Lewis v. Steamship Co.,* 132 N. C., 904, and other cases), and it is equally well settled that negligence may be proven by circumstantial evidence, and that "if the facts proved render it probable that the defendant violated its duty, it is for the jury to decide whether it did so or not." Shear. & Red. on Neg., sec. 58, approved in *Fitzgerald v. R. R.,* 141 N. C., 535; *Henderson v. R. R.,* 159 N. C., 583.

The question therefore raised by the motion for judgment of nonsuit is whether there is evidence which renders it probable that the entry or tunnel where the intestate was required to work was unsafe, and that this caused his death.

The tunnel or entry was twelve feet wide. A railroad track ran near the middle of the tunnel, the rails being 44 inches apart. The cars projected beyond the rail 12 or 14 inches on each side. This condition left a space of about three feet on each side between the cars and the sides or walls of the entry for the use of the employees of the defendant, but this space was not left open.

One witness testified: "The slate that we call 'gob' was piled up like a wall, along under the roof outside the railroad between the rail and the rib. There was a space of 12 or 14 inches on either side of the rail that was free of gob."

Another witness: "The condition of that entry at that time at the place we found him under the car was very bad, in very bad shape. There was not sufficient room on either side of the cars between the outside of the rail and the rib of the entry at the point of accident for a person to walk or pass in safety while the cars were in motion. In order for a driver to perform his duties with a reasonable degree of

safety I think the entry should be kept clear of all rubbish and sufficient distance from the car for a man to pass through at any place along the entry."

Another: "Slate and gob stuff was on the outside of the rail stocked up like a wall; ties, props and things like that were lying across the road; slate piled up along the road; could not pass a car in some places, had to climb over."

Another: "The entry at the place where we found him in the car was pretty well gobbed up, slate and gob on each side of the car; there was no room for a person to have walked between the outside rail and the rib; there was slate and dirt and a few rotten timbers. I have worked off and on in the mines for the last 12 years. In order that the driver may perform his duties with ordinary safety I should think the entry should be clear, should be clean between the rib and rails along so that if an accident should happen you could have room to get in the clear."

There is evidence favorable to the defendant, but on a motion for nonsuit we must not only accept the evidence of the plaintiff as true, but he is also entitled to have every reasonable inference considered in his favor, and, so dealing with the evidence, it is shown that the space of three feet between the cars and the ribs or sides of the entry, provided for the use and safety of the employees, was closed except as to 12 or 14 inches, and this small space was covered with debris; that the conditions were bad and dangerous, and it is a reasonable inference that the deceased tried to walk on the outside of the rails and stumbled and fell, or that he was forced between the rails by the conditions on the outside, and was there struck by the cars and run over and killed, and in either event the defendant would be liable, without regard to the particular way in which he met his death, in the absence of contributory negligence, which is not relied on.

We are therefore of opinion the motion for judgment of nonsuit was properly overruled.

The defendant also relies on the plea of the statute of limitations of one year, based on the following facts:

The deceased was killed 8 September, 1917, and this action was commenced on 3 June, 1918. The plaintiff did not allege in the original complaint the statute of Virginia giving a right of action for wrongful death, but was allowed to amend and so allege, more than one year after, and within two years of the death.

The defendant contends that this amendment does not relate back to the commencement of the action, and is the equivalent of a new action, but it was held otherwise in *Renn v. R. R.*, 170 N. C., 128, and if this was not true, the Virginia statute puts the matter at rest. It provides

that actions for wrongful death "shall be brought by and in the name of the personal representative of such deceased person, and within twelve months after his or her death, but if any such action is brought within said period of twelve months after said party's death, and for any cause abates or is dismissed without determining the merits of said action, the time said action is pending shall not be counted as any part of said period of twelve months, and another suit may be brought within the remaining period of said twelve months, as if such former suit had not been instituted," so that if the amendment be treated as a dismissal of the first action and the institution of a new one, the latter was commenced within twelve months of the first, and it within twelve months from the death, which brings it clearly within the statute, and the action is not barred.

No error.